**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **In re:** | ) | **Case No.: 26-42401-169** |
| | ) | |
| **TEGETHOFF DEVELOPMENT, LLC,** | ) | **Honorable Bonnie L. Clair** |
| | ) | **Chapter 11 Proceeding** |
| Debtor. | ) | |
| | ) | |
| **In re:** | ) | **Case No.: 26-42402-169** |
| | ) | |
| **TEGETHOFF DEVELOPMENT CO, LLC,** | ) | **Honorable Bonnie L. Clair** |
| | ) | **Chapter 11 Proceeding** |
| | ) | |
| Debtor. | ) | |
| **In re:** | ) | **Case No.: 26-42403-169** |
| | ) | |
| **PEARL CAPITAL MANAGEMENT LLC,** | ) | **Honorable Bonnie L. Clair** |
| | ) | **Chapter 11 Proceeding** |
| Debtor. | ) | |
| | ) | |

**DECLARATION OF JEFFREY TEGETHOFF IN SUPPORT OF**
**DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY RELIEF**

Jeffrey Tegethoff hereby declares under penalty of perjury:

1. I am the sole manager and member of Tegethoff Development, LLC ("TD"). As such, I am familiar with TD's day-to-day operations, business affairs, and books and records.

2. I am the Trustee of the JJT Revocable Trust dated November 27, 2017, the sole member of Tegethoff Development Co, LLC ("TD Co"). As such, I am familiar with TD Co's day-to-day operations, business affairs, and books and records.

3. I am the sole member of Pearl Capital Management LLC ("PCM" and together with TD and TD Co, each individually a "Debtor" and collectively, the "Debtors"). As such, I am familiar with PCM's day-to-day operations, business affairs, and books and records.

4. On June 1, 2026 (the "Petition Date"), Debtors each filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

5. I submit this Declaration in support of the first day applications and motions in Debtors chapter 11 cases (the "Chapter 11 Cases"). Any capitalized term not expressly defined herein shall have the meaning ascribed to that term in the relevant first day motion or application. Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, my review of relevant documents, or my opinion based upon my experience and knowledge of Debtors' operations and financial condition or information reported to me in the course of my duties by Debtors' officers, agents, or employees. If I were called upon to testify, I could and would testify competently to the facts set forth herein. I am authorized to submit this Declaration.

6. Part I of this Declaration describes Debtors' business and the circumstances surrounding the filing of the Chapter 11 Cases. Part II sets forth the background of the purported prepetition secured debt, and Part III sets forth the relevant facts in support of Debtors' various first day applications and papers filed concurrently herewith.

## I. BACKGROUND

7. TD is a luxury lifestyle real estate developer in the Midwest, predominantly engaged in delivering trophy assets with a 'develop to own forever' mindset. Since 2015, TD and its predecessor PCM has developed and partnered on over 4,000 apartments units, 550 hotel room key and 5,000,000 SF of industrial buildings totaling over $1.5 Billion in development value.

8. TD's general business model involves working with investors to develop projects, stabilize them from a tenancy perspective, and sell them to fund continued operations.

9.      Prior to 2020, PCM was the key operating entity behind substantially the same operation as TD. I owned 50% of PCM until 2020 when I bought out my partner to consolidate singular control over all of the Debtor entities. PCM still maintains some legacy projects, but it does not plan to continue to seek out new business. Since 2020, TD has served as the exclusive developer and owner of all new projects.

10.     TD Co is an S-Corp that serves as the developer arm for personnel, benefits and payroll. All three Debtor entities work together to operate a singular business model and they each profit from the industry relationships and experience of the other.

11.     Prior to filing, the Debtors' financial situation was generally stable with substantial cash flow. The impetus for the Chapter 11 Cases was a $13,000,000 consent judgment in favor of Solera Pearl, LLC, Solera Expo LLC, and Aspen Investment Group, LLC (the "Judgment") for an alleged breach of a settlement agreement by TD and PCM. While TD Co was not directly implicated by the Judgment, as its business operations are inextricably intertwined with TD and PCM, its financial situation was similarly impaired by the Judgment. The Judgment gave rise to aggressive collection efforts which necessitated the need for relief.

12.     I believe the Debtors will be able to service the judgment through a plan while continuing to operate their businesses and service their other debts.

## II.      DEBTORS' PREPETITION SECURED DEBT

13.     The bulk of the Debtors' secured debt lies in corporate guaranty agreements for real estate projects, each of which is backed by the subject real estate collateral, which in each case is owned by a downstream entity. In each case, I believe the subject creditor is oversecured by the value of the real estate. Besides its debt secured by real estate, TD has a restricted account with UMB Bank which is pledged, in addition to certain real estate, as collateral for its guaranty

obligation. TD also has a $4,000,000 obligation owed to Robert G. Clark as trustee of Robert G. Clark Revocable Living Trust U/T/A Dated December 1, 1994 secured by an interest in future distributions made to TD.

### III.   MOTIONS AND APPLICATIONS

14.   An important element of Debtors' successful Chapter 11 Cases is approval of each of the Debtors' motions and applications submitted concurrently herewith.  Factual information in support of such orders is provided below and in the applications and motions filed concurrently herewith.

### Joint Administration of these Chapter 11 Cases

15.   To facilitate the efficient administration of these Chapter 11 Cases, Debtors filed a *Motion for Entry of an Order Directing joint Administration of Chapter 11 Cases* (the "Joint Administration Motion").

16.   As more particularly set forth in the Joint Administration Motion, the Debtors share common ownership; the nature of business and business structure of the Debtors is substantially similar; the Debtors share several of the same secured and unsecured creditors, and TD and PCM share the same primary judgment creditor (see generally the Judgment as defined above); and the procedural burdens that might be placed upon the Debtors and other creditors to file multiple pleadings in each of these cases warrant their joint administration.

17.   For these reasons, it is in the best interest of the Debtors, the creditors, and all other parties in interest for these Chapter 11 Cases to be jointly administered.

### Retention of Carmody MacDonald P.C.

18.   Continued representation of Debtors by their counsel, Carmody MacDonald P.C. ("CM"), is critical to the success of Debtors' Chapter 11 Cases because CM is uniquely familiar

with Debtor's business and legal affairs as more fully set forth in Debtor's *Application to Employ Debtors' Counsel and for Approval of Compensation Arrangement Related Thereto* and the *Declaration of Robert E. Eggmann in Support of Debtors' Application to Employ Debtors' Counsel and for Approval of Compensation Arrangement Related Thereto* (the "Eggmann Declaration").

19. Debtors selected the firm of CM as attorneys because of the firm's experience and knowledge in the field of debtors' and creditors' rights and business reorganizations under chapter 11 of the Bankruptcy Code.

20. Debtors desire to employ the firm of CM because of the extensive legal services that will be required in connection with the Chapter 11 Cases.

21. The services of attorneys under a general retainer are necessary in order to enable the Debtors to faithfully execute their duties as debtor in possession. Subject to further order of this Court, CM will be required to render, among others, the following services to the Debtors:

a. Advising Debtors with respect to its rights, power, and duties in these Chapter 11 Cases;

b. Assisting and advising Debtors in their consultations with any appointed committee relative to the administration of this Chapter 11 Cases;

c. Assisting Debtors in analyzing the claims of creditors and negotiating with such creditors;

d. Assisting Debtors with investigation of the assets, liabilities, and financial condition of Debtors and reorganizing Debtors' business in order to maximize the value of Debtors' assets for the benefit of all creditors;

e. Advising Debtors in connection with the sale of assets or business;

f. Assisting Debtors in their analysis of and negotiation with any appointed committee or any third party concerning matters related to, among other things, the terms of a plan of reorganization;

g.     Assisting and advising Debtors with respect to any communications with the general creditor body regarding significant matters in these Chapter 11 Cases;

h.     Commencing and prosecuting necessary and appropriate actions and/or proceedings on behalf of Debtors;

i.     Reviewing, analyzing, or preparing, on behalf of Debtors, all necessary applications, motions, answers, orders, reports, schedules, pleadings, and other documents;

j.     Representing Debtors at all hearings and other proceedings;

k.     Conferring with other professional advisors retained by Debtors in providing advice to Debtors;

l.     Performing all other necessary legal services in these Chapter 11 Cases as may be requested by Debtors in these Chapter 11 Cases; and

m.     Assisting and advising Debtors regarding pending arbitration and litigation matters in which Debtors may be involved, including continued prosecution or defense of actions and/or negotiations on Debtors' behalf.

22.     The firm of CM has indicated a willingness to act on behalf of the Debtors.

23.     To the best of Debtors' knowledge, Robert E. Eggmann and the other members, counsel, and associates of the firm of CM (i) do not have any connection with the Debtors, its affiliates, creditors, or any other parties-in-interest, or their respective attorneys and accountants, (ii) are "disinterested persons," as that term is defined in section 101(14) of the Bankruptcy Code, and (iii) do not hold or represent any interest adverse to the estate, except as set forth herein and in the Eggmann Declaration filed concurrently herewith.

## Insurance Motion

24.     TD maintains various insurance policies (collectively, the "Insurance Policies") through third-party insurance carriers (the "Insurance Carriers") as set forth in Exhibit A to *Debtor's Motion for Authority to Maintain Existing Insurance* (the "Insurance Motion").

6

25.     By the Insurance Motion, TD seeks authority to maintain the Insurance Policies and practices related thereto.  TD also seeks authority to pay any obligations that come due under the Insurance Policies, including premiums and fees.

26.     The Insurance Policies provide TD with essential insurance coverage.  Any interruption in such coverage would expose TD to serious risks, including:  (a) the possible incurrence of direct liability for the payment of claims that otherwise would have been payable by the Insurance Carriers; (b) the possible incurrence of material costs and other losses that otherwise would have been reimbursed by the Insurance Carriers; (c) the possible inability to obtain similar types and levels of insurance coverage; and (d) the possible incurrence of higher costs for re-establishing lapsed policies or obtaining new insurance coverage.

27.     For these reasons, TD believes that maintaining continued and uninterrupted insurance coverage under the favorable terms and conditions provided by the Insurance Carriers clearly is in the best interests of TD, the other Debtors, their estates, and their creditors. Accordingly, TD seeks authority to pay all of the post-petition installment payments as they come due.

Dated: June 8, 2026

 /s/ Jeffrey Tegethoff
Jeffrey Tegethoff