**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **In Re:** | ) | **Chapter 11 Proceeding** |
| | ) | **Honorable Bonnie L. Clair** |
| **TEGETHOFF DEVELOPMENT, LLC,** | ) | |
| **TEGETHOFF DEVELOPMENT CO, LLC, and** | ) | **Case No. 26-42401-169** |
| **PEARL CAPITAL MANAGEMENT LLC,** | ) | **(Jointly Administered)** |
| | ) | |
| **Debtors.** | ) | **Hearing Date: August 5, 2026** |
| | ) | **Hearing Time: 1:00 p.m. CT** |
| | ) | **Hearing Location: Courtroom 5** |
| | ) | **North St. Louis, Missouri** |

# OBJECTION TO MOTION OF LAKEPORT HOTEL, LLC AND OASIS AT LAKEPORT, LLC GRANTING RELIEF FROM THE AUTOMATIC STAY TO TERMINATE DEVELOPMENT AGREEMENT OR, ALTERNATIVELY TO FORCE REJECTION OF THE DEVELOPMENT AGREEMENTS

COMES NOW Debtor Tegethoff Development Co, LLC ("**TD Co**") and Tegethoff Development LLC ("**TD**") (collectively, the "**Debtors**"), by and through counsel, and for their Objection (the "**Objection**") to the Motion of Lakeport Hotel, LLC and Oasis at Lakeport, LLC (collectively "**Lakeport**") Granting Relief from the Automatic Stay to Terminate Development Agreement or, Alternatively to Force Rejection of the Development Agreements (the "**Motion**"), state to the Court as follows:

## PRELIMINARY STATEMENT

1. The Motion at hand arises from a coordinated scheme to seize control of the Lakeport Village project — a major entertainment and residential development in Osage Beach, Missouri — from the Debtors. After Jeffrey Tegethoff, the sole member and manager of TD and TD Co, raised concerns about potential self-dealing by one of the key co-venturers in the Lakeport Project (as the term is used in the Motion), said co-venturer, acting through the entities referred to herein as Lakeport, embarked on a campaign of retaliation designed to squeeze Mr. Tegethoff, TD,

and TD Co out of the Lakeport Project to their detriment. That campaign came to a head on January 30, 2026, when Lakeport purported to remove Mr. Tegethoff as Manager of the project entities, and has culminated in the instant Motion.

2. Lakeport's argument relies on alleged defaults of the Development Agreements and the various operating agreements of the Lakeport Entities, but their Motion attempts to mislead this Court by leaving out key facts that give rise to legitimate defenses to the alleged defaults. TD Co has already been shut out of the Lakeport Project—there is no urgency in terminating the Development Agreements because Lakeport already has a substitute developer in Skyview Hotel Partners, LLC. The only reason Lakeport is seeking the instant relief is that they want this Court to legitimize their allegations that TD Co breached the various Development Agreements so they can avoid paying fully earned development fees owed to TD Co. In the event this Court is persuaded by Lakeport's arguments without the need for a full scale trial on the merits of their claims, the Debtors request this Court limit its ruling to allow Lakeport to deliver notice of termination of the Development Agreements without making any finding of facts regarding the alleged defaults so that Debtors can property defend themselves in the appropriate forum and protect their interest in any development fees owed (regardless of whether such fees were converted to equity) and TD's equity interests in the Lakeport Project more generally.

## GENERAL BACKGROUND

3. On June 1, 2026 (the "**Petition Date**"), Tegethoff Development LLC ("**TD**"), TD Co, and Pearl Capital Management LLC ("**PCM**") each filed respective voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Missouri.

4. On June 18th, 2026, the Court entered an Order Directing Joint Administration of these Chapter 11 Cases (the "**Chapter 11 Cases**").

5. Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, Debtors are continuing to operate their businesses as debtors in possession. No trustee or examiner has been appointed, and no official committee of creditors or equity interest holders has been established in these Chapter 11 Cases.

## FACTUAL BACKGROUND

6. The Lakeport Project is a major development project involving the conversion of a former timeshare resort property into an entertainment and residential complex. The Lakeport Project is located in Osage Beach, Missouri.

7. Big T LLC ("**Big T**") is a member of Lakeport Village LLC, and a party to the Operating Agreements governing the Lakeport Village project.

8. Big Thunder Marine Fabrication LLC ("**Big Thunder Marine**") was awarded the dock construction contract for the Lakeport Village project under the circumstances described herein and received $1,100,000 in reimbursements at or around bond closing.

9. Fred Ross ("**Ross**") is the principal of Big T and Big Thunder Marine and a co-venturer in the Lakeport Project. Ross, through Big T, is a member of Lakeport Village LLC.

### A. The Bond Dispute

10. The Lakeport Project was partially funded through a bond issuance. Mr. Tegethoff served as the primary representative to the underwriter, bank and investors in connection with the bond sale. Mr. Tegethoff was the "pitch man" who secured the financing, while Ross played a secondary role.

11. The bond issuance consisted of senior bonds ("**A-Bonds**") and subordinated bonds ("**B-Bonds**"). All of the A-Bonds were successfully sold to investors.

12. The B-Bonds could not be fully placed with outside investors. As a result, Mr. Tegethoff and Ross were each required to purchase a portion of the unsold B-Bonds.

13. Ross was angered by the requirement that he purchase B-Bonds. Ross was forced to obtain a loan and pledge substantial collateral to fund his B-Bond purchase. On information and belief, Ross blamed Mr. Tegethoff and the Debtors for this outcome.

14. On information and belief, Ross's anger over the B-Bond purchase became a catalyst for his subsequent retaliatory conduct, including the self-dealing described below.

**B. Alleged Self-Dealing and Excessive Reimbursements**

15. Ross, through Big Thunder Marine, submitted a bid to perform dock construction work for the Lakeport Project. Big Thunder Marine's bid was the highest bid among those submitted for the dock construction work.

16. After the B-Bond dispute described above, Ross unilaterally raised Big Thunder Marine's bid price by approximately 40%, from approximately $5 million to approximately $7 million. Upon information and belief, this price increase was retaliatory in nature and was not justified by any change in the scope of work, materials costs, or market conditions.

17. Despite the inflated pricing and the obvious conflict of interest, the dock construction contract was approved. Upon information and belief, Ross himself approved or procured the approval of the transaction.

18. The dock construction contract violated the Non-Arms-Length Provisions of the Operating Agreements[1] because the terms were materially worse than those available in an arms-length transaction. The contract constituted self-dealing by Ross.

19. At or around bond closing, Ross also caused the Lakeport Project to pay reimbursements of $3,475,517 to Big T and $1,100,000 to Big Thunder Marine.

20. Upon information and belief, the total reimbursements paid to Ross and his affiliated entities over the life of the Lakeport Project are substantially greater than the amounts documented at bond closing and may approach or exceed $10 million in the aggregate. The full amount and nature of these reimbursements have not been disclosed to Mr. Tegethoff despite repeated demands for a full accounting.

21. Upon information and belief, the amount and nature of these reimbursements were not authorized under the Operating Agreements, were not properly disclosed, and were excessive relative to any legitimate expenses incurred by Ross on behalf of the Lakeport Project.

22. Additionally due to pressure from Ross and Big T, the Lakeport Project gave Big T a $5,000,000 cash guaranty fee, while TD was forced to contribute its $3,500,000 guaranty fee.

23. Big T also received over $4,500,000 in cash reimbursement at the loan closing in November 2025.

24. Ross's extraction of these reimbursements left the Project short of cash at critical junctures, including at or near bond closing, directly harming the Debtors and the other stakeholders in the Lakeport Project.

---

[1] The OAs contain provisions requiring that contracts between the project entities and any member or affiliate must be on terms at least as favorable to the entity as those obtainable in an arms-length transaction (the "**Non-Arms-Length Provisions**"). See, e.g., OA §5.7 (Lakeport Village LLC) [Exhibit C to the Motion Doc. 114]; §8.4 (Oasis at Lakeport 1 LLC) [Exhibit E to the Motion Doc. 114].

### C. The Wilson Transaction

25. Drew Waldron ("**Waldron**") holds the Certified Financial Planner designation and is a co-founder of Canvas Wealth Advisors ("**CWA**"). At all relevant times, Waldron served as: (a) Mr. Tegethoff's financial advisor and fiduciary; (b) Ross's financial advisor (Ross and his family were Waldron's single largest client); and (c) the manager of Canvas Oasis Lakeport LLC and Canvas Oasis Hotel LLC, the Canvas-affiliated investment entities that hold interests in the Lakeport Project.

26. Prior to the bond closing, the Lakeport Project needed approximately $2 million in additional funds. Mr. Tegethoff had been running Lakeport Project expenses through the Debtors and needed to fund the shortfall.

27. Waldron arranged for another client of CWA, Jordan Wilson (the "**Wilson**"), to loan TD $2 million. The loan came to TD since the funds would be used for the parking garage which did not have a funding source until the bonds closed. Waldron connected Mr. Tegethoff with Wilson, proposed the form of loan documents to be used, and structured the transaction. The terms of the loan required TD to pay a 10% return over one year and to convey 1% of TD's promote interest in the Lakeport Project to Wilson.

28. Throughout the process, Waldron pressured TD to accept the loan to "keep the project on track" and represented to Mr. Tegethoff that "Fred would take care of him." Upon execution of the loan documents, Waldron immediately forwarded the signed paperwork to Tom Vale, Ross's Chief Financial Officer at Iconic Marine, and reported that the loan needed to be repaid at bond closing. As such, Ross, Big T, and Lakeport were all well aware of the transaction.

29. The $2 million loan could not ultimately be repaid at bond closing as Waldron and Vale had directed, in substantial part because Ross and Big T elected to take guarantee fees and

reimbursements at closing, and there were insufficient remaining funds to satisfy the Wilson loan. Waldron's assurance that "Fred would take care of" Mr. Tegethoff proved hollow — Ross's extraction of funds at closing left Tegethoff exposed on the Wilson loan.

**D. The Sham Audit**

30. After Mr. Tegethoff raised concerns about Ross's self-dealing on the dock contract and other financial misconduct, Ross initiated a campaign to retaliate against Mr. Tegethoff and the Debtors and to remove them from the Lakeport Project.

31. As part of this campaign, Ross engaged Flint Development Solutions LLC ("**Flint**") — a direct competitor of TD in the development industry — to conduct a purported financial audit of Mr. Tegethoff and his entities.

32. The Flint audit was not a legitimate, independent financial review. It was initiated by Ross for the purpose of manufacturing claims against Mr. Tegethoff to justify his removal and to create leverage in any dispute.

33. Flint was difficult and adversarial in its dealings with Mr. Tegethoff and the Debtors. The initial results of the Flint audit claimed that Mr. Tegethoff and the Debtors owed approximately $22 million to the Lakeport Project or to Ross.

34. Each time Mr. Tegethoff and the Debtors had the opportunity to review and substantiate the claimed amounts, the figures shrank dramatically. The claimed amount was reduced from approximately $22 million to approximately $14 million, then to approximately $12 million, then to approximately $9.2 million, and most recently to approximately $3 million. The Debtors believe that the true amount of any discrepancy is zero and that the alleged misappropriation is baseless.

35. The dramatic and continuing reduction in the claimed amounts — from $22 million to approximately $3 million — demonstrates that the initial figures were grossly inflated, unsupported, and generated in bad faith. Lakeport's monetary default allegations are just that—allegations. They have not been substantiated, and they have not been reduced to a judgment. There has not been an evidentiary hearing to determine the validity of any of these allegations contained in the Motion.

**E. The Removal of Mr. Tegethoff as Manager**

36. On or about January 30, 2026, Ross and his allies executed a Written Consent purporting to remove Mr. Tegethoff as Manager of the project entities, characterized as a "Major Decision Approval."

37. Mr. Tegethoff and the Debtors dispute the procedural and substantive validity of the January 30, 2026 removal. Mr. Tegethoff's removal was retaliatory.

38. Since Mr. Tegethoff's removal as Manager, Ross has systematically excluded Mr. Tegethoff from all aspects of the Lakeport Project and thereby excluded TD Co from undertaking its duties as the project developer. Mr. Tegethoff has been excluded from meetings with the general contractor, the project architect, the lender, and city officials. In January 2026, Ross publicly announced that Tegethoff had resigned as developer, which was not true. Ross also directed TD's logo be removed from the project signage in January 2026. This exclusion has prevented TD Co from continuing to operate as the developer on the Lakeport Project.

**ARGUMENT**

39. Section 362(d)(1)-(2) of the Bankruptcy Code provides that:

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—

> (1) for cause, including the lack of adequate protection of an interest in property of such party in interest;
>
> (2) with respect to a stay of an act against property under subsection (a) of this section, if—
>
> (A) the debtor does not have an equity in such property; and
>
> (B) such property is not necessary to an effective reorganization[.]

11 U.S.C. § 362(d). The party in interest has the burden of proof on the issue of the debtor's lack of equity in the property and the debtor has the burden on all other issues pursuant to 11 U.S.C. § 362(g).

40.

**I. Lakeport is not entitled to relief from the automatic stay under 11 U.S.C. § 362(d)(1) as they have failed to establish cause.**

41. Lakeport correctly states that cause for relief from stay under 11 U.S.C. § 362(d)(1) exists where it is impossible for the Debtors to assume an executory contract. Under 11 U.S.C. § 365(b) if a default has occurred under the executory contract, the debtor must cure the default or provide adequate assurance that it will do so to be able to assume the contract. Notably, it is Lakeport's burden to establish a default exists *In re FKA FC, LLC*, 545 B.R. 567, 573-574 (Bankr. W.D. Mich. 2016). If they meet this burden, it is then then the Debtors' burden to prove that such default can be cured. *Id*.

42. Lakeport alleges various defaults including (i) failure to disclose material litigation; (ii) misappropriation and unauthorized use of project funds; (iii) developer cost overruns; (iv) breach of the lien reserve agreement; and (v) various other breaches under the operating agreements. Notably, all of Lakeport's allegations of misappropriation of funds stem from allegations related to comingling of funds—allegations which are unsubstantiated by Lakeport's own biased audit. Moreover, the Debtors dispute the wildly inflated monetary default alleged by

Lakeport. Moreover, it is Lakeport's burden to establish a default exists and it has only presented conjecture of misuse based on dollar amounts transferred into and out of TD's main operating account, an account which was used for various projects. Even if the Debtors were to owe Lakeport a monetary obligation, they have sufficient equity holdings in the Lakeport Project that it could use to cure such monetary defaults. As the Debtors have not sought to assume or reject the Development Agreements, they have not made a proposal yet despite their ability and right to do so.

43. As for the lien reserve funds, it is clear that a pool of money sufficient to cover the alleged monetary obligation is currently held in trust and will be disbursed once the alleged tax obligation is paid. The Debtors are currently negotiating a plan that would allow the tax obligation to be paid in full, thus any alleged default would be cured by said plan once the escrowed funds are released.

44. Additionally, as set forth above, Lakeport comes to its Motion with unclean hands. Ross and Lakeport have breached the Development Agreements and various operating agreements by self-dealing and artificially inflating the costs of the Lakeport Project to the Debtors' detriment. These breaches give rise to various causes of action against Lakeport, Ross, Waldren, Big T, and other third parties both named and unnamed, the proceeds of which may very well offset any alleged default obligation owed to Lakeport.

45. As for the alleged non-monetary defaults, Lakeport concedes that courts have disagreed on the requirement to cure non-monetary defaults. Notably an entire body of courts have held that only ***material*** non-monetary defaults must be cured for an executory contract to be assumed. *See In re Welcome Grp. 2, LLC*, 675 B.R. 352, 370 (Bankr. S.D. Ohio 2025) ("This Court is persuaded by the analysis of the courts that hold that an incurable default

prohibits assumption only if the default is material or substantial economic harm has resulted from the default…"); *In re Vent Alarm Corp., No*. 15-09316-MCF11, 2016 WL 1599599, at *2 (Bankr. D.P.R. Apr. 18, 2016) ("We adhere to the approaches reached in these courts' conclusions in order to maximize the viability of a debtor's ability to assume a contract in bankruptcy and hold that Debtor's delay did not constitute a material contractual default."); *In re Cumberland Corral, LLC*, No. 313-06325, 2014 WL 948473, at *10 (Bankr. M.D. Tenn. Mar. 11, 2014) ("even if there were defaults under the Franchise Agreements ... such defaults were immaterial and have not caused substantial economic detriment"); *In re Clearwater Nat. Res., LP*, No. 09-70011, 2009 WL 2208463, at *4 (Bankr. E.D. Ky. July 23, 2009) ("This court finds the reasoning articulated by the New Breed court to be persuasive, and concludes that it is the materiality and economic significance of the default which is the measure of whether a debtor may assume a contact in which a non-curable, non-monetary default has occurred." ); *In re Chapin Revenue Cycle Mgmt., LLC*, 343 B.R. 728, 732 (Bankr. M.D. Fla. 2006) (granting motion to assume when "the Debtor did in fact default..., but that the default was not material and did not cause a significant economic detriment"); *In re Walden Ridge Dev., LLC*, 292 B.R. 58, 67 (Bankr. D.N.J. 2003) ("where the default is non-monetary the debtor may be precluded from assuming an executory contract only if the default is material or if the default causes substantial economic detriment").

46. The alleged non-monetary defaults here are not material. The alleged failure to disclose material litigation did not impact the Debtors' ability to perform their primary economic duties under the Development Agreements or the Operating Agreements. TD Co. and Mr. Tegethoff were more than willing to continue their duties as developer and manager respectively of the Lakeport Project. The Wilson Transfer was not only immaterial, it was known by Ross and Lakeport as set forth above. Again, this transfer did not result in any economic impact to Lakeport

or the Lakeport Project and need not be cured in order for the Development Agreements to be assumed. As TD Co may be able to assume the Developer Agreements, Lakeport has failed to establish cause to grant it relief from the automatic stay.

## II. Lakeport is not entitled to relief from the automatic stay under 11 U.S.C. § 362(d)(2) as they have failed to establish the Debtors do not have equity in the property.

47. It is clearly established that Lakeport has the burden of proof on the issue of the debtor's lack of equity in the property and the Debtors have the burden on all other issues pursuant to 11 U.S.C. § 362(g). As more particularly described above, Lakeport has not conclusively established that TD Co and/or TD do not have any equity in the Development Agreements. While the developer fees owed to TD are fully earned, on information and belief, Lakeport is seeking relief from stay so they can pursue their ultimate goal of not delivering TD's developer fee portion of distributions owed upon a capital event. As the fees have not been paid yet, it is imperative that the Debtors be able to defend their right to said fees.

48. Moreover, Lakeport relies on their alleged defaults as justification for their position that the Debtors have no equity in the Development Agreements. As the alleged monetary defaults are unsubstantiated allegations based on a dubious and biased audit, they should not be recognized as legitimate and the Court should recognize that the Debtors have an interest in any fees owed pursuant to the Developer Agreements.

49. At this time, the Debtors are formulating a plan based on its equity interests that would purport to pay all unsecured creditors in full over the life of the plan. That said, the Debtors would need to receive the income that they are owed to continue operations through the life of the plan—which would include any fees owed to the Debtors pursuant to the Developer Agreements. As such, the Developer Agreements are critical for the reorganization of the Debtors.

50. Because Lakeport has failed to establish that TD Co does not have any equity in the Development Agreements and TD Co has shown that the Development Agreements are crucial for the reorganization of the Debtors, Lakeport should be denied relief from stay.

**III. Even if relief from the automatic stay is granted, the relief should be limited such that Lakeport is granted leave to deliver notice of termination to Debtors and pursue any subsequent relief it may be entitled to in the proper venues.**

51. Through their actions both before and during this case, Lakeport has shown a vindictive distain for Mr. Tegethoff and the Debtors. Regardless of any obligation that may rightfully be owed to TD, TD Co, or Mr. Tegethoff, Lakeport will do everything in their power to avoid payment. As such, the Debtors worry that if relief from stay is granted, Lakeport will use any substantive ruling of this court as evidence of the alleged wrongdoing of Mr. Tegethoff, TD, and TD Co in the future litigation over the earned development fees that will certainly ensue.

52. As such, to avoid further harm to the Debtors' estate, if this Court determines that relief from stay is appropriate despite the Debtors' arguments, the Debtors request the court limit its order by only granting Lakeport leave from the automatic stay to deliver a notice of termination to TD Co as developer and to pursue any subsequent remedies that may stem from such notice of termination. To the extent such a notice of termination is delivered, TD Co requires the ability to contest such termination as wrongful and to take all legal action required to defend its and TD's interest(s) in the earned developer fees. Unless the Court requires the parties submit to a protracted evidentiary hearing on the merits of the Motion before granting it, any findings of fact may be based on information that is incomplete or unfounded—TD Co simply requests the Court not allow Lakeport the opportunity present such findings as fact in future litigation over these vary issues.

**IV. Lakeport cannot request the Court to compel rejection.**

53. In the event the Court determines that relief from the automatic stay is not appropriate, Lakeport has requested that the Court compel the Debtors to reject the Development Agreements. "To the extent courts have considered whether it is appropriate to *compel* rejection, they have reached the conclusion that it is not." *In re IYS Ventures, LLC*, 659 B.R. 308, 336 (Bankr. N.D. Ill. 2024) (citing *Crown Equip. Corp. v. Toys "R" Us, Inc.*, No. 3:18-CV-810-JAG, 2019 WL 2713051, at *2 (E.D. Va. June 28, 2019) ("Section 365 allows courts to approve an assumption of a contract, not to compel parties to assume a contract. Accordingly, the Bankruptcy Court lacked the authority to use its equitable powers to compel TRU to assume the MSA.") (citations omitted); *Ryan, Inc. v. Circuit City Stores, Inc.*, No. 3:10CV496-HEH, 2010 WL 4735821, at *3 (E.D. Va. Nov. 15, 2010) ("In this case, Ryan did not file a motion merely to compel a decision; it filed a motion to compel assumption. As the Bankruptcy Court correctly concluded, there is no authority supporting Ryan's position that the non-debtor party to an executory contract should be able [to compel] the Debtors to assume the Ryan Contract. Indeed, Ryan conceded at the April 29 hearing before the Bankruptcy Court that it had not found any authority supporting its position.") (footnote, quotation and citations omitted); *In re Sundial Asphalt Co., Inc.*, 147 B.R. 72, 80 (E.D.N.Y. 1992) ("The Court finds nothing in the statute or the Bankruptcy Rules providing for rejection or assumption of an executory contract by any party other than the trustee or debtor in possession[.]")).

54. If this Court is otherwise persuaded that the assumption or rejection of the Development Agreement is of the utmost urgency, this Court may order the debtor to determine within a specified period of time whether to assume or reject under Section 365(d)(2) of the Bankruptcy Code—but that relief has not been requested.

WHEREFORE, Debtor Tegethoff Development Co, LLC respectfully requests that this Court enter an Order denying the Motion of Lakeport Hotel, LLC and Oasis at Lakeport, LLC Granting Relief from the Automatic Stay to Terminate Development Agreement or, Alternatively to Force Rejection of the Development Agreements; or, to the extent it grants said motion, to limit its order to merely grant Lakeport relief to deliver a notice of termination; and for such other and further relief as this Court deems just and proper under the circumstances.

Respectfully submitted,

CARMODY MACDONALD P.C.

By:/s/ *Robert E. Eggmann*_________
ROBERT E. EGGMANN #37374MO
SAMUEL S. BRAND #73638MO
120 S. Central Avenue, Suite 1800
St. Louis, Missouri 63105
(314) 854-8600
(314) 854-8660 – FAX
ree@carmodymacdonald.com
ssb@carmodymacdonald.com

*Attorneys for Tegethoff Development, LLC and Tegethoff Development Co, LLC*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of this document was filed electronically with the United States Bankruptcy Court and has been served on the parties in interest via email by the Court's CM/ECF system as listed on the Court's Electronic Mail Notice List on this 29th day of July, 2026.

/s/ *Robert E. Eggmann*